Filed 12/29/20  In re M.S. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re M.S., a Person Coming Under the Juvenile Court Law. | B304998<br>(Los Angeles County<br>Super. Ct. No. 19CCJP05789) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.S.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Kim L. Nguyen, Judge.  Affirmed.

John E. Carlson for Defendant and Appellant.

Mary C. Wickham, County Counsel, and Jacklyn K. Louie Deputy County Counsel, for Plaintiff and Respondent.

Aida Aslanian, under appointment by the Court of Appeal, for minor M.S.

_____

The juvenile court sustained allegations in a dependency petition under Welfare and Institutions Code section 300, subdivisions (b), (d), and (j),[1] regarding J.S.'s (Father) sexual abuse of his former girlfriend's daughter, L.G., and the resulting risk of harm to Father's biological daughter, M.S. (L.G.'s half sibling). The juvenile court also removed M.S. from Father's custody. On appeal, Father challenges the jurisdictional findings and the disposition order regarding M.S. on grounds the trial court erred (1) in granting L.G.'s motion to quash Father's subpoenas for L.G.'s medical records under the physician-patient privilege and excluding, under Evidence Code section 352, evidence Father sought to introduce at the adjudication hearing that L.G. tested positive for a sexually transmitted disease during these proceedings and Father did not; and (2) in denying Father's motion to disqualify the children's counsel, made after the adjudication hearing, on grounds counsel had a conflict of interest in representing both L.G. and M.S., and Father did not receive a fair hearing as a result.[2] We reject Father's contentions and affirm the jurisdictional findings and the disposition order regarding M.S., as to Father.

_____

[1] Statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2] On appeal, Father does not challenge the sufficiency of the evidence supporting the jurisdictional findings.

2

## BACKGROUND

### I. The Family

When the Los Angeles County Department of Children and Family Services (DCFS) received the referral in this case in September 2019, 15-year-old L.G. lived with her mother, M.R. (Mother).[3] The whereabouts of L.G.'s biological father, J.G., were unknown, and he did not participate in these dependency proceedings. Mother and Father shared custody of their then five-year-old daughter M.S. under an informal arrangement. They had ended their relationship when M.S. was around one and a half years old. Up until a year before the referral at issue, L.G. sometimes accompanied M.S. when M.S. spent time with Father.

### II. The Referral

In August 2019, at the start of her junior year of high school, L.G. was assigned an essay about challenges she had faced in her life. She wrote in the essay that a former boyfriend of Mother sexually abused her, starting when she was 10 years old, and culminating in a rape the weekend before her sophomore year of high school (August 2018), when she was 14 years old. L.G. did not describe the rape or any of the other incidents of sexual abuse in her essay.[4]

On September 3, 2019, about two weeks after L.G. wrote the essay, a school counselor interviewed L.G. and filled out a

---

[3] Mother is not a party to this appeal.

[4] L.G. also wrote in the essay about not having her biological father in her life and about witnessing domestic violence between Mother and a former boyfriend of Mother (not Father).

Suspected Child Abuse Report form, as a mandated child abuse reporter under Penal Code section 11166. On the form, the counselor provided the following summary of L.G.'s account of the sexual abuse by Father, as provided during the interview: "On 8/11/2018 L[.G.] was laying [o]n the edge of the bed in [Father]'s home when L[.G.]'s sister, M[.S.] was also sleeping in. While L[.G.] was pretending to be asleep, [Father] touched L[.G.]'s buttocks 'over clothes' for about 5 min then took of[f] her shorts and underwear while he was masturbating. He then proceeded to grab L[.G.]'s breast under her shirt. He continued to masturbate and ejaculated on her buttocks. Then, he penetrated his penis into L[.G.]'s [v]agina. She began to cry and he immediately put his and L[.G.]'s shorts back on. He then began to rub Vaseline in between L[.G.]'s legs. [Father] then told L[.G.] that he was going to kill himself because he was going through a hard time. [Father] did not kill himself, instead he took L[.G.] and M[.S.] to Disneyland the same day of [the] incident to ease the tension. L[.G.] also claims that [Father] began molesting [her] in fifth grade and continued th[r]ough the age of 14."

Also on September 3, 2019, the school counselor contacted DCFS and made a referral regarding L.G.'s account of sexual abuse by Father.

## III.   DCFS's Detention Report and Dependency Petition

As stated in DCFS's Detention Report, prepared on or about September 5, 2019, a DCFS social worker contacted Mother by telephone and in person on September 3, 2019, the date of the referral, and informed her about L.G.'s statements regarding sexual abuse by Father. According to the social worker, Mother appeared surprised and became tearful. She stated L.G. had not

4

told her about the abuse.  Mother agreed to immediately bring L.G. to a DCFS office for an interview.

When Mother and L.G. arrived at the DCFS office, Mother asked to speak privately with the social worker before L.G.'s interview.  Mother stated L.G. had just disclosed during the drive to the office that Father raped her in August 2018.  Mother told the social worker that she "asked [L.G.] if she bled as she was a virgin."  In response to that inquiry, L.G. explained to Mother that Father penetrated her anus with his penis.  L.G. also told Mother that after the incident, Father stated he was very depressed about the death of his brother, which had occurred two months before the incident.  Mother recalled Father's demeanor had changed, and he had appeared depressed, after his brother's death.  L.G. also told Mother that after the incident, Father took her and M.S. to the bank, to visit his brother's grave, and then to Disneyland.  Mother recalled that after the trip to Disneyland, L.G. stopped sleeping at Father's home.  Mother explained L.G. "was not particularly close to [Father], and would only sleep over at the urging of [M.S.]"  During the drive to the DCFS office, which only lasted a few minutes, L.G. did not disclose to Mother any other incidents of sexual abuse.

Mother stated that during the two and a half years she was in a relationship with Father, he "spent a significant amount of time at her home, but never officially moved in . . . ."  He "maintained a separate residence with [M.S.'s] paternal grandparents," where he continued to live at the time of the referral.  Mother told the social worker that L.G. "was left alone with [Father] on numerous occasions . . . ."  Mother also explained that although L.G. stopped visiting with Father in August 2018, L.G. continued to have contact with him, up to the

5

time of the September 3, 2019 referral, because Mother used L.G. as a go-between during M.S.'s custody exchanges because Father "would make inappropriate comments to [Mother] during the child's [M.S.] exchange."

Mother reported Father was " 'a good dad to M[.S.],' " and Mother had no concerns about M.S. (or L.G.) being in Father's custody "until this disclosure." Mother explained she did have a talk with Father several months before, after M.S. told Mother on a few different occasions that "she no longer wanted to take a 'purple little ball that she had to put under her tongue to make her go to sleep' that was given to her by [Father]." When Mother asked Father about it, he stated the pills were vitamins his sister had given him. His explanation "did not make any sense" to Mother because she knew he and his sister were "not on speaking terms." Mother stated she did not take further action on the matter because it had been several months since M.S. mentioned the pills.

After speaking with Mother, the social worker interviewed L.G. in private. According to the Detention Report, L.G. indicated "the allegations [were] accurate as reported."[5] She explained she disclosed the rape in the school essay and to a friend. She came close to telling Mother about it on two earlier occasions, but she could not bring herself to do so.

---

[5] It is not clear if this statement refers to the report made by the school counselor, which described a vaginal penetration, or the report made by Mother, which described an anal penetration. The Detention Report does not provide a summary of L.G.'s statements about the reported rape during this particular interview with the social worker.

L.G. stated Father "first began to touch her inappropriately" when she was around 10 years old and in the fifth grade. Sometimes while she was trying to sleep, Father would lift her up, "sit her on his genital area," and push on her back so that her body pressed against his genitals. She would pretend to be asleep during these encounters because "she was terrified and did not know how to react." L.G. further explained that as she "matured," Father " 'wrestled' with her, and used this as an opportunity to 'press his body against [her,]' specifically the genital areas." She stated Father "began having erections during these encounter[s] as she entered adolescence (approximately 12 years old)." These incidents occurred in Mother's home about once a week until Mother and Father ended their relationship. L.G. reported that Mother was in a different room or at a neighbor's home during these incidents. After Mother and Father's relationship ended, the incidents continued to occur when L.G. accompanied M.S. to Father's home, at M.S.'s urging. On at least three such occasions, Father asked L.G. "to change from her jeans to his basketball shorts," telling her " 'it was more comfortable.' " L.G. told the social worker, she " 'figured out that he could feel more' " when she was wearing basketball shorts instead of jeans.

DCFS reported the sexual abuse allegations to law enforcement. Two police officers responded to the DCFS office, and the officers and the social worker privately interviewed L.G.[6]

_____

[6] To avoid repetition, we do not summarize here statements L.G. made in this interview that are consistent with statements she made in her earlier interview with the social worker. We summarize additional information L.G. reported in this subsequent interview. As discussed below, purported

7

As set forth in the Detention Report, L.G. explained that during the incidents that occurred when she was trying to sleep (described above), after Father picked her up, he would "sit her on his genital area" or "lay her on him (stomach to stomach)." Neither she nor Father said anything during, or had any discussion about, these incidents. While Mother and Father were in a relationship, these incidents occurred at Mother's home and sometimes at Father's home. At Mother's home (a one-bedroom apartment), L.G. either slept in the same bed as Mother and Father, on the floor of the bedroom, or on the couch (presumably in the living room).

L.G. stated that during the " 'wrestling' " incidents that began when she entered middle school (described above), Father "would tell [her] to 'slap him' and when she refused, he would take her hand and make her slap him on the face." He also pulled her hair during the wrestling incidents. When L.G. "would feel [Father] becoming erect" during the wrestling incidents, as he "press[ed] his genital area against her genital area," she "would kick him or push him away."

L.G. described to the police officers and the social worker an incident when she was 13 years old (which would have been after Mother and Father's relationship ended). She stated she

_____

inconsistencies among L.G.'s various interviews and trial testimony, as characterized by Father, are central to Father's contentions on appeal. Thus, with each successive interview and L.G.'s trial testimony, we aim to summarize information that is in addition to or different from information L.G. provided before (as reported by L.G. or those to whom she disclosed the information). Some repetition is unavoidable, however, in recounting additional or different information regarding the incidents of sexual abuse.

was lying down with her eyes closed (presumably at Father's home), when Father briefly "touched her under her shirt on top of her bra."

L.G. also discussed "the referral incident" with the police officers and the social worker. L.G. reported the incident occurred at Father's home when she was 14 years old. M.S. had asked L.G. to accompany her to Father's home. They spent the night there and were supposed to return to Mother the next morning. The three of them slept in Father's bed, with Father on the side of the bed against the wall, four-year-old M.S. in the middle, and L.G. on the other side of the bed.

According to L.S., at around 5:00 a.m., on the morning after she spent the night at Father's home, she woke when Father left the bed to go to the bathroom. When he returned, he pushed her to determine if she was awake, and she stayed still. Around 10 minutes later, he picked her up, stating she was " 'about to fall off the bed,' " although she was "nowhere near the edge." After he put her down, L.G. " 'moved in towards [her] sister more,' " lying on her stomach. Father climbed on her back and pulled down her jeans and underwear. He masturbated and ejaculated on her legs. Then he penetrated her anus with his penis "several times." L.G. cried, as she was "terrified" and "in great pain." When Father "finished, he applied petroleum jelly on her legs and tried to pull up her pants while he apologized to her." L.G. "went to the bathroom to clean the fluids off her body as she continued to cry." She stated that her crying woke M.S. and M.S.'s paternal grandfather (who, as noted above, lived with Father). M.S. tried to comfort L.G. According to L.G., Father was also crying, and he was upset that L.G. refused to look at him. He told L.G. "that he would kill himself if she ever disclosed" what occurred.

L.G. also reported that later the same morning, Father took her and M.S. to the bank, and showed them a bank statement. He told L.G. that all the money in his accounts was for her and M.S. Then, Father took the girls to his brother's grave. Thereafter, he asked them what they wanted to do. M.S. said she wanted to go to Disneyland. L.G. agreed to go to Disneyland because she "did not want to leave M[.S.] alone with [Father], after what he had done to her [L.G.]" After the Disneyland trip, L.G. stopped visiting Father, and she "attempted to limit the amount of contact she had with him."

L.G. stated she did not seek medical treatment after Father anally penetrated her. She reported that "for at least a week or more, she was depressed and had feelings of loss of pleasure in things she once enjoyed, difficulty sleeping, etc." She told the officers and social worker that she was interested in going to therapy to address the sexual abuse.[7]

On September 4, 2019, the day after Mother's and L.G.'s interviews, a DCFS social worker interviewed Father. He denied sexually abusing L.G. (or M.S.). He referred to L.G. as his stepdaughter. He stated L.G. "would come over to his house with her sister M[.S.] and spend the night and [the] girls would sleep on the bed and he would 'sleep on the floor.' " He lived in a two-bedroom apartment. He explained M.S.'s paternal grandfather slept in the other bedroom, "so he would share the room with the girls when they came over." He said he could not recall the last time L.G. slept at his apartment, but he knew " 'it was a while

_____

[7] Soon thereafter, L.G. began counseling, and she continued to attend throughout the course of these proceedings.

ago.' " He reported he continued to see M.S. every other weekend.

On September 6, 2019, DCFS filed a dependency petition under section 300, subdivisions (b), (d), and (j), alleging Father's sexual abuse of L.G. endangered L.G. and placed M.S. at risk of harm.[8] DCFS did not detain L.G. or M.S. from Mother, but detained M.S. from Father.

At the September 9, 2019 detention hearing, the juvenile court found DCFS made a prima facie showing that L.G. and M.S. were persons described by section 300. The court ordered M.S. detained from Father, and L.G. and M.S. to remain released to Mother. The court ordered monitored visitation between Father and M.S. and required Father to stay at least 100 yards away from L.G. The court also ordered DCFS to obtain medical services for both girls at a Medical Hub Clinic.

## IV. Forensic Interview of L.G.

On September 11, 2019, about a week after her interviews with the police officers and the social worker, L.G. submitted to a forensic interview conducted by the USC Child Interviewing Lab. The juvenile court admitted the DVD and transcript of the interview into evidence at the February 3, 2020 adjudication hearing (along with all reports DCFS had submitted up to that point).

L.G. stated that the incidents of molestation by Father began during the second semester of fifth grade, when she was

---

[8] The petition also included an allegation about Father's alcohol use, based on Mother's statements to the social worker (not described herein). The juvenile court later dismissed that allegation at the adjudication hearing, finding DCFS did not meet its burden of proof as to that allegation.

nine years old.  The first incident of Father picking her up and placing her on top of him occurred in Mother's bedroom, when she was trying to fall asleep in Mother's bed.  After five to eight minutes of Father pressing down on her lower back, causing her body to rub against his penis, he moved her back onto the bed.  A few minutes later, he left the room.  Neither of them spoke during the incident.  L.G. stated her eyes filled with tears after Father left the room because she did not want him to touch her like that.

L.G. explained that the incidents of Father picking her up and placing her on top of him always occurred in her Mother's bed.  She described one such incident that occurred while there was a party going on in the living room for Mother's birthday, and her younger cousin was on the floor of Mother's bedroom during the incident.

During this interview, L.G. described an additional incident of molestation—a "wrestling" incident—that she stated occurred at Father's home the night before Father anally penetrated her.  Although she told the police officers and the social worker about wrestling incidents with Father, as set forth above, she did not tell them about this particular wrestling incident.  L.G. stated she and M.S. were on the couch in Father's apartment.  M.S.'s paternal grandfather was not yet home.  Father "pinned [L.G.'s] arms down" and "taunt[ed]" her, stating he was stronger than she was.  She "tried to push up, but [she] couldn't."  He rubbed his penis against her vagina.  She pushed him with her legs, and he moved off her.

L.G. stated this same type of wrestling incident had occurred around 10 to 15 times.  She explained, "I would like say like that I was stronger than him or that I could like beat him up

12

or whatever, and then he'd say that he was stronger than me, and that I couldn't get up because he was pushing down on me, and then he continued that and then he'd grind up against me . . . ." She also stated Father would sometimes ask her to slap him, and if she did not, he would grab her wrist and cause her to slap him (as she had relayed to the police officers and the social worker). She added that Father would also sometimes put his mouth on her ear, "kind of nibbling on it." If she felt that Father's penis was erect during these incidents, she would use her legs to push him off her.

L.G. told the interviewer about sleeping in bed with Father and M.S. the night before the final incident of sexual abuse. She stated she was sleeping on her stomach, and Father would climb over her and rub his body against hers each time he exited or came back to bed. She woke around 5:00 a.m. About 30 minutes later, Father climbed onto her back and began rubbing his penis against her buttocks. She heard him take off his basketball shorts and then his underwear. He rubbed his penis against her buttocks a few more times. Then he began masturbating. He took off the basketball shorts he had given her to wear, and then he pulled down her underwear. He touched her vagina with his finger. He rubbed his penis against her buttocks and vagina, skin-to-skin. He grabbed her breasts under her shirt and bra. Then he penetrated her anus with his penis for a few seconds. She cried in pain, and he stopped and climbed off her. At some point prior to the penetration, he ejaculated onto her buttocks, legs, and back.

L.G. stated that after Father climbed off her, he "pulled up [her] underwear really quick." Then he put Vaseline on her legs and lower back. He told her to "stop crying" and "calm down" so

13

she would not wake M.S. and M.S.'s paternal grandfather. She continued to cry. M.S. woke up and started rubbing L.G.'s arm. Then M.S. used either her hand, a napkin, or a wipe to rub L.G.'s lower back. Father continued to put Vaseline on the back of L.G.'s legs. M.S.'s paternal grandfather entered the room "and asked what was wrong." Father said something in Spanish that L.G. could not recall. The paternal grandfather responded, "oh ok," and left the room, closing the door. Father told L.G. and M.S. to get ready to leave. L.G. got dressed, helped M.S. get dressed, and they went to the car. L.G. stated she was still crying when they went to the car.

As L.G. was starting to tell the interviewer about their trip to the bank, she stated: "Oh wait I missed a part that he told me. We were still in the, we're still in the room and I was still crying. He kept telling me to look up at him and he said he was gonna kill himself and that he didn't need to do it because he was just depressed over his brother's death []. And he told me, he told me that he was sorry a few times. He told me to look up at him a bunch of times and told me he was gonna kill himself like five times."[9]

---

[9] We include this deviation in L.G.'s chronology of events because Father highlights it in support of his argument that counsel for L.G. and M.S. could not effectively represent M.S. without challenging "conflicts" or "discrepancies" in L.G.'s accounts of the events, which Father claims that counsel did not do because she had an actual conflict of interest in representing both children. As explained below, we conclude the juvenile court did not err in concluding there was no actual conflict of interest in counsel's representation of L.G. and M.S.

L.G. resumed telling the interviewer about the trip to the bank.  She stated that when Father returned to the car after going to the bank, he showed her and M.S. a document on his phone, and he pointed to a number on it.  He told them "all that money that was there" was for her and M.S. to use when they went to college.  Then he asked them what they wanted to do.  L.G. did not answer.  M.S. told him she wanted to go to Disneyland.  He said he would take them to Disneyland, but first he took them to his brother's grave.  Thereafter, he took them to Disneyland, "and he pretended like nothing ever happened that day."  L.G. stated her body was still in pain when they went to Disneyland.  A few months later, she told her friend that Father had raped her.

## V.    Jurisdiction/Disposition Report

As set forth in DCFS's October 21, 2019 Jurisdiction/Disposition Report, during a September 30, 2019 interview with a DCFS dependency investigator, L.G. stated that after Father sodomized her and put Vaseline on her, he gave M.S. "a wet wipe" that M.S. used to wipe L.G.'s back.  In the report, DCFS characterized L.G.'s statements regarding Father's sexual abuse as "consistent."

The dependency investigator also interviewed Mother on September 30, 2019.  DCFS wrote in the Jurisdiction/Disposition Report:  "Mother also indicated that M[.S.] told her once that her 'daddy would put a "pica" on the back of L[.G.]'s legs.'  In Spanish pica means bite or prick.  M[.S.] also told her that she had taken a wipe and wiped off something from L[.G.]'s leg.  Mother stated that M[.S.] told her this shortly after the incident where [Father] allegedly abused L[.G.]."

15

On October 3, 2019, the dependency investigator interviewed M.S.'s paternal grandfather, who stated he did not believe the allegations against Father were true. He indicated Father had always treated L.G. like a daughter. DCFS wrote in the Jurisdiction/Disposition report: "He [the paternal grandfather] did state that on the night in question he did come into [F]ather's room because their bathrooms were adjacent to each other and he heard that [F]ather was awake. He stated that he remembers [F]ather and M[.S.] were sleeping on the bed and that L[.G.] was sleeping on the floor. He stated he does not remember saying anything to [F]ather and does not believe L[.G.] was crying at the time which is why he did not ask her any questions."

DCFS reported in the Jurisdiction/Disposition report that Father's visits with M.S., which were monitored by M.S.'s maternal grandmother, were going well. DCFS recommended the juvenile court order reunification services for Father.

## VI. Pre-Trial Submissions and Motions

On October 18, 2019, Father filed written objections to L.G.'s statements in DCFS's reports, the police report, and the school essay on hearsay grounds.[10] (§ 355.)

In a Last Minute Information for the Court, dated December 12, 2019, DCFS reported Father was arrested for the

---

[10] Father also objected on the same grounds to witness statements that we have not referenced in this opinion because the juvenile court sustained the objections at the February 3, 2020 adjudication hearing.

16

sexual abuse of L.G., and he was currently out on bail.[11] DCFS also stated Father had completed a parenting class.

In an amended witness list for the adjudication hearing, filed January 24, 2020, Father indicated he planned to call, among other witnesses, two doctors who would testify about L.G.'s positive test results for a sexually transmitted disease, another doctor who would testify about Father's negative test results for a sexually transmitted disease, and L.G.'s school counselor who would testify about L.G.'s statements regarding the sexual abuse.[12] Father had served subpoenas for attendance at trial and for production of documents on the two doctors who had treated L.G., seeking all medical records from January 1, 2018 to the present, and on the school counselor, seeking records of all therapeutic services.

On January 29, 2020, counsel for L.G. and M.S. filed on behalf of L.G. a motion to quash the subpoenas directed to the two doctors who had treated L.G., as well as the subpoena directed to L.G.'s school counselor. Counsel argued in the motion (1) that Father failed to properly serve the subpoenas on L.G., and (2) that the subpoenas sought records protected by the physician-patient privilege.

In a Last Minute Information for the Court, dated February 3, 2020, DCFS reported on statements M.S. made to her therapist, about two weeks before her sixth birthday,

---

[11] The outcome or status of Father's criminal case is not clear from the record.

[12] All of these medical tests were conducted more than a year after the last incident of sexual abuse occurred, according to L.G.'s statements.

regarding the events of August 11, 2018 (the date of the reported rape), when she was four and a half years old. DCFS stated in the Last Minute Information for the Court: "[The social worker] asked for [the therapist] to relay what happened during the session. [The therapist] stated that she started talking with M[.S.] about her missing her dad. [The therapist] explored if she understands why she can't see her dad every day. M[.S.] reported that she understands her dad did something bad to her sister. [The therapist] inquired as to what [F]ather did. M[.S.] reported that she was visiting at her dad's house and L[.G.] was there. M[.S.] reported that she remembers that she was sleeping and when she woke up she saw L[.G.] crying. M[.S.] stated that she also saw 'pica' on L[.G.]'s back. [The therapist] was not able to get clarification as to what 'pica' was. M[.S.] reported that she helped L[.G.] by wiping it off her back. [The therapist] inquired where [F]ather was at this time. M[.S.] reported that her dad was in the room. M[.S.] reported that she saw her dad wearing pajama shorts. M[.S.] stated that she didn't see anything physically happen to L[.G.] M[.S.] disclosed feeling scared. She had no other concerns. M[.S.] has expressed being happy and wants to sleep."

## VII. Adjudication

### A. Evidentiary rulings

At the outset of the February 3, 2020 adjudication hearing, the juvenile court overruled Father's hearsay objections to L.G.'s statements in DCFS's reports, the police report, and the school essay, as L.G. was present in court as a witness for DCFS and available for cross-examination by Father's counsel.

Thereafter, the juvenile court heard oral argument on L.G.'s motion to quash the subpoenas directed to her two treating

physicians and to her school counselor. Father's counsel argued the juvenile court should deny the motion to quash as to the two doctors because L.G. waived the physician-patient privilege by failing to object when DCFS distributed to all parties its Delivered Service Log or "Title XX's," which disclosed L.G. tested positive for Chlamydia (a sexually transmitted disease) at a medical evaluation conducted at a Medical Hub Clinic after DCFS filed the dependency petition in this case (more than a year after the last reported incident of sexual abuse). Father's counsel stated Father was "prepared as well to put [his] medical records before the court to demonstrate that he does not have Chlamydia, and he could not have given [L.G.] Chlamydia."

Father's counsel argued evidence of L.G.'s positive test result for a sexually transmitted disease was relevant to these proceedings because L.G. denied engaging in sexual activity with anyone other than Father, as set forth in DCFS's Delivered Service Log, and her positive test result for a sexually transmitted disease demonstrates "she's being deceitful to the Department [DCFS] and to her mother." Counsel further argued, if L.G. "has manifestations" of the infection, she "knew about the Chlamydia. She maybe was even told by somebody else that they had given her Chlamydia. This child had to find a scapegoat. And the person that was most easily a scapegoat to her was a person that her mother does not like at all. And that is a reason for her to blame my client -- among other things -- but to blame my client to get the focus off of her and how she has apparently become sexually active and to blame somebody else for the reason she got Chlamydia."

The juvenile court granted L.G.'s motion to quash the subpoenas seeking her medical records. The court concluded L.G.

19

did not waive her physician-patient privilege because she did not put her medical condition at issue in these proceedings, so the patient-litigant exception to the physician-patient privilege did not apply. The court did not reach the other ground on which the motion to quash was based—that service of the subpoenas on L.G. was improper.

The juvenile court also excluded under Evidence Code section 352 all evidence of L.G. testing positive for Chlamydia (including witness testimony), as well as evidence Father sought to admit that he "does not have Chlamydia, never had Chlamydia, and has never been prescribed the medication that is needed to treat Chlamydia." The court found the "probative value of [L.G.] testing positive for Chlamydia or not, the probative value of her being sexually active with anyone but [Father] or not[,] is of limited probative value," and such evidence "is substantially outweighed by the likelihood of undue prejudice."[13]

---

[13] The juvenile court deferred its ruling on L.G.'s motion to quash the subpoena directed to L.G.'s school counselor (which sought records of all therapeutic services provided to L.G.) until the court had an opportunity to review the documents the counselor brought to court in response to the subpoena. During the second day of the adjudication hearing, on February 4, 2020, the court admitted into evidence the Suspected Child Abuse Report form the school counselor prepared (referenced above) and excluded other documents the counselor brought to court in response to the subpoena.

### B. Witness testimony

#### 1. L.G.

On February 3, 2019, the first day of the adjudication hearing, L.G. and M.S.'s counsel called L.G. as a witness. L.G. testified in chambers, with all counsel present. She discussed the various incidents of sexual abuse she had disclosed before, beginning with the rape.[14] L.G. testified that when M.S. woke after the incident and asked what was wrong with L.G., Father told M.S. "he put pica stuff on [L.G.]'s back." L.G.'s understanding was that "pica stuff" meant something that burned. M.S. climbed off the bed and went to get a wipe to clean the stuff off L.G.'s back.

L.G. testified that the wrestling incident at Father's home on August 10, 2018 happened on the bed in Father's bedroom (and not on the couch as she had stated in her forensic interview). She added that the incident began when Father came to the bed, where she was lying, and gave her a hug and then told her he loved her. She stated she spent the night at Father's home on three occasions and a wrestling incident occurred on each of those three occasions.

Father's counsel asked L.G. if she tested positive for Chlamydia, and the trial court sustained the other parties' objections under Evidence Code section 352, consistent with the court's prior ruling.

---

[14] We do not summarize here all of L.G.'s testimony about the various incidents of sexual abuse, as we have described her statements about these incidents above. We highlight here additional or different information in L.G.'s testimony.

### 2. Mother

On February 4, 2019, the second day of the adjudication hearing, L.G. and M.S.'s counsel called Mother as a witness. During direct examination, Mother testified about the informal custody arrangement regarding M.S. that she and Father established around two years before the adjudication hearing. Mother explained she and Father shared custody of M.S. during the week and alternated weekends with her. When it was a parent's turn to have M.S. for the weekend, M.S. spent Friday night at that parent's home. The schedule was flexible, and Mother and Father would deviate from the schedule to accommodate each other.

During cross-examination by Father's counsel, Mother acknowledged that on occasion, Father picked up M.S. from Mother at 5:00 a.m., due to Mother's early work schedule. Father's counsel showed Mother a series of text messages between Mother and Father, indicating Father either picked up M.S. from Mother, or dropped off M.S. to Mother, at around 5:00 a.m. on various dates not connected with the events at issue in this case. Mother authenticated these text messages, and the juvenile court admitted them into evidence.

Father's counsel also showed Mother a series of text messages between Mother and Father, beginning on August 8, 2018, the Wednesday before the referral incident (the reported rape). On Friday, August 10, 2018, at 3:22 p.m., Father texted Mother: "I missed your call[.] What's up? I've asked you multiple times to please not curse at me in front of M[.S.] . . ." Mother authenticated these text messages, and the juvenile court admitted them into evidence.

The next page of text messages Father's counsel showed Mother did not show a date indicating when the text messages were sent or received, but Father's counsel argued the messages were a continuation of the conversation that began at 3:22 p.m. on August 10, 2018 (as set forth above). Father asserts these text messages, which we quote below, demonstrate L.G. and M.S. spent the night with Mother on August 10, 2018, and Father picked them up at 5:00 a.m. on August 11, 2018, the day he took them to Disneyland. Thus, he argues L.G. was lying when she stated/testified that she and M.S. spent the night at Father's home the night before the reported rape.

Father texted Mother: "You telling me 'Fu** [*sic*] you keep you [*sic*] days' isn't cool to say to me in front of M[.S.]" Mother responded with a text, stating: "Stop texting me . . . . . [*sic*] Pick up M[.S.] at 5 am tomorrow at 5 a.m. on Monday tomorrow [*sic*] at 5 a.m. on Monday morning tomorrow [*sic*] and 5 a.m. on Monday morning." Father then stated: "I just called you to clarify the schedule because me picking up M[.S.] at 5am seems like she's very tired." Mother responded: "Please stop texting me[.] [I]t's my day with M[.S.] and I want to spend my time with her[,] not waste my time talking to you. . . . (Ellipses in original.) Father replied: "So if I'm bothering you on your day with M[.S.] by communicating with you about her schedule, please do the same on my days with her. Thank you on the agreement." The next text message in the series showed a date of August 11, 2018, and a time of 3:21 p.m. The message was from Father to Mother, stating: "Would you like me to drop off the girls at your mom[']s house?" Then, at 6:32 p.m. on August 11, 2018, Father texted Mother pictures of M.S. and L.G. at Disneyland. Based on

23

Mother's testimony regarding these text messages, the juvenile court admitted them into evidence.

During examination by her own counsel, Mother testified Father never picked up M.S. from her at 5:00 a.m. on a weekend day; he only picked up M.S. at 5:00 a.m. on weekdays when she worked. She stated Father picked up M.S. and L.G. at night on August 10, 2018, and the girls spent the night with him on August 10, 2018 and went to Disneyland with him on August 11, 2018.

During examination by counsel for L.G. and M.S., Mother stated she did not remember what she meant when she texted Father: "Pick up M[.S.] at 5 am tomorrow at 5 a.m. on Monday tomorrow [*sic*] at 5 a.m. on Monday morning tomorrow [*sic*] and 5 a.m. on Monday morning." Her first interpretation was that she was telling Father to pick up M.S. at 5:00 a.m. on Monday (not Saturday, August 11, 2018). But then she stated she could not remember.

### 3. Vanessa L.

On February 4, 2020, Father called his friend, Vanessa L., as a witness. She stated she and Father were together at a friend's home on the night of August 10, 2018. She testified she had a time-stamped video reflecting she and Father were together "[p]ast 11:00" p.m. on that night. Father's counsel did not present a video during (or at anytime after) the adjudication hearing.

During cross-examination by DCFS's counsel, Vanessa testified she arrived at the friend's house around 9:30 p.m., and Father arrived at the friend's house sometime thereafter. According to Vanessa, Father left the friend's house sometime after 11:00 p.m. on August 10, 2018.

### 4. Evelyn S.

On February 4, 2020, Father called his sister, Evelyn S. as a witness. She testified she made a phone call to Father between 10:00 and 11:00 p.m. on August 10, 2018. He told her he was at his friend Vanessa's house. She asked Father during the call: "Why are you out so late? Aren't you going to take the girls to Disneyland the next day?" Father responded he was "just hanging out with friends," and he "was going to go home later on." According to Evelyn, Father explained during the call that he was originally supposed to pick up M.S. and L.G. from Mother at 8:00 a.m. on August 11, 2018, but he and Mother "had switched it to 5:00 a.m."

### 5. Jose S.

On February 4, 2020, Father called M.S.'s paternal grandfather, Jose S., as a witness. He testified with the assistance of a Spanish language interpreter. He stated during direct examination that on the morning of August 11, 2018—the date of the reported rape—he woke at 6:00 a.m., as he always did on Saturday mornings. As he walked to the bathroom, he noticed the door to Father's bedroom was open, as it usually was. When he exited the bathroom, he looked into Father's bedroom and observed Father lying on the floor with M.S.; L.G. was lying in the bed. No one was crying, and he had not heard anyone crying that morning. No one in Father's bedroom was asleep. The paternal grandfather recalled that when he looked into Father's bedroom that morning, he said something to M.S. in Spanish, as he was trying to teach her to speak Spanish.

The paternal grandfather also testified during direct examination that Mother was not "allowed to come up" to Father's apartment because she "had bad communication with

25

[Father] all the time." He further testified that he had observed Mother yelling at Father "in a rage" in front of L.G. "[m]any times."

Also during direct examination, the paternal grandfather stated the social worker who interviewed him in preparation of the Jurisdiction/Disposition Report, interviewed him in English and did not review his statement with him. On cross-examination by Mother's counsel, the paternal grandfather reiterated he saw Father, L.G., and M.S. in Father's bedroom on the morning of August 11, 2018, even though the Jurisdiction/Disposition Report indicates he saw the trio in Father's bedroom at night.

## C.    Jurisdictional Findings

On February 4, 2019, the second day of the adjudication hearing, after the close of evidence, the juvenile court heard oral argument on jurisdiction. Counsel for L.G. and M.S. urged the court to sustain allegations b-1, d-1, and j-1 regarding Father's sexual abuse of L.G. and the resulting risk of harm to M.S., arguing:

"I think this comes down to an evaluation of credibility. On the one hand we have L[.G.] giving vivid, consistent descriptions of a rape and molestation. They were consistent to her statements to the social worker, her essay, her forensic interview. We all saw her in-camera testimony.

"On the other hand, we have testimony from Father's friend, Father's sister, Father's father with oddly specific recollections of a date that occurred 17 months ago. The text messages, which were admitted into evidence, . . . I will point out that all of the text communications describing a 5:00 a.m. pick up or drop off of M[.S.] occurred on a weekday, save for Father's

26

[exhibit] 15 [the undated page of text messages referenced above], in which we have garbled run-on sentences from Mother, [that] to me, read like continuation of an ongoing argument.

"It's clear that they [Mother and Father] had a fairly good relationship, actually, based on the tenor of these text message[s]. It's notable that the parents have an informal parenting agreement. I think we have all seen, if their relationship was so contentious, that it would cause L[.G.] to manufacture a rape and molestation allegation to vindicate her mother, there would have been a paternity order involved.

"I think L[.G.]'s in-camera testimony was very descriptive and should provide the basis for the allegation[s]."[15]

Father's counsel argued next.[16] His argument was lengthy. He did *not* assert there was a potential or an actual conflict of interest in counsel for L.S. and M.S. representing both children— one of his contentions now on appeal—and he had not yet made

---

[15] We do not address the parties' arguments regarding allegation b-2 regarding Father's alcohol use because the juvenile court dismissed that allegation at the conclusion of the adjudication hearing, and the allegation is not at issue on appeal.

[16] Father's counsel requested a continuance of the adjudication hearing, so he could prepare for argument, stating: "I wanted to play a few of the parts of the taped video recording [from L.G.'s forensic interview], and I wanted to have this prepared to show the court, and I don't. And I was hoping to have an opportunity to go through all the testimony and do the compare and contrast and represent my client effectively." The juvenile court denied Father's request, stating it had watched the video recording, reviewed the documentary evidence, and heard the testimony. Father does not challenge the ruling on appeal.

such an assertion up to this point in the dependency proceedings below.  At the beginning of his argument, Father's counsel noted L.G. is "a young girl who doesn't have a father, who sees her sister who has a very active father."  Counsel also described L.G. as "a troubled girl," who may be "jealous of her sister."  Counsel described L.G.'s "story" as "ridiculous," stating the incidents of molestation sounded like something that would occur between high school or junior high school kids.  He argued at length that L.G.'s various accounts of the sexual abuse—to the police officers and social worker, the forensic interviewer, and during her trial testimony—were inconsistent, asserting, "[t]here's three separate stories about what happened."  Next, Father's counsel argued the evidence Father presented (the text messages and witness testimony from his friend, sister, and father) demonstrated L.G. and M.S. did not spend the night at Father's home on August 10, 2018, so L.G.'s "story" about a rape at his home in the early morning on August 11, 2018, "doesn't make sense."  He concluded his argument by stating:  "It didn't happen.  This man [Father] loves M[.S.] to death.  He has a fantastic relationship with her, and the worst thing that can happen for M[.S.] is for that relationship to be impaired by a lie.  And the court should protect M[.S.]"

Mother's counsel urged the juvenile court to sustain the sexual abuse allegations against Father, stating Mother "fully believes her daughter [L.G.]"  Mother's counsel highlighted M.S.'s statement that she helped L.G. wipe something off L.G.'s back as evidence corroborating L.G.'s account of the rape.  Mother's counsel also asserted Father's argument—that a rape could not have happened the morning of August 11, 2018 because L.G. and M.S. did not spend the night at Father's home on August 10,

2018—fails because (1) M.S.'s paternal grandfather told the social worker he saw the girls in Father's room "on the night in question," as set forth in the Jurisdiction/Disposition Report, and (2) even if the girls did not sleep at Father's home on August 10, 2018, the rape could have happened the morning of August 11, 2018, based on the paternal grandfather's trial testimony that he saw Father, L.G., and M.S. lying down in Father's bedroom in the early morning on August 11, 2018.

DCFS's counsel joined in the arguments of counsel for L.G. and M.S., and argued L.G. was "consistent in her statements," and L.G.'s testimony was "more credible than the contrary statements." In addressing the risk of harm to M.S., DCFS's counsel noted (1) some of the incidents of sexual abuse occurred while M.S. was present in the same room, and (2) Father "always treated [L.G.] like a daughter," according to M.S.'s paternal grandfather.

The juvenile court dismissed allegation b-2 regarding Father's alcohol use and sustained allegations b-1, d-1, and j-1 as follows: "On numerous prior occasions, . . . [Father] sexually abused the child L[.G.], between the ages of ten through fourteen. On a prior occasion [Father] raped the child L[.G.], while the child M[.S.] was in the same bed. On prior occasions, [Father] penetrated the child's anus with [his] penis, resulting in the child feeling pain. On prior occasions, [Father] forced the child to slap [him]. On prior occasions, [Father] pulled the child's hair. On prior occasions, [Father] ejaculated on the child's legs. On prior occasions, [Father] rubbed [his] penis against the child. [Father] forced the child to sit on [his] penis while applying pressure on the child's buttocks. On prior occasions, [Father] wrestled with the child and pressed [his] erect penis against the child's body.

On prior occasions, [Father] pressed against the child's buttocks with [his] penis, rubbed [his] penis against the child's vagina and grabbed the child's buttocks with [his] hands. On a prior occasion, [Father] forcefully removed the child's clothing, masturbated in the presence of the child and placed [his] erect penis on the child's legs. [Father] threatened to kill himself if the child disclosed the sexual abuse. Such sexual abuse of the child L[.G.] by [Father] endangers the child's physical health, safety and well-being and places child and the child's sibling M[.S.] at risk of serious physical harm, damage, danger and sexual abuse."

In sustaining the allegations, the juvenile court commented: "I think L[.G.]'s statements are credible. I found her testimony credible in chambers. She testified with an affect that demonstrates to the court that she was telling the truth about the sexual assault, about the sexual molestation. And I believe her. I found her credible. And her statements overall to law enforcement, to the social worker, to the court[,] during the forensic interview, all had themes and strands that were entirely consistent. [¶] Now, it's certainly true that there were some discrepancies, but I don't think that takes away from her credibility, after the court had the opportunity to view her and observe her while she testified."

Addressing the risk of harm to M[.S.] the juvenile court stated: "L[.G.] testified that the molestation began when she was nine, and she was in fifth grade. She made a point that it began to escalate when she started to develop breasts, which means that she was prepubescent. M[.S.] is prepubescent. Also [Father]'s father testified that [Father] always treated L[.G.] like a daughter. Thereby, putting M[.S.] at risk because M[.S.] is [Father]'s biological daughter. [¶] Also, the court finds true that

30

some of the sexual abuse, including the most recent episode or incident that L[.G.] described, occurred in the presence of M[.S.] as well.  Thereby placing her at risk as well."

The juvenile court continued the matter to February 13, 2020 for disposition.

## VIII.  Post-Adjudication Motions and Report

On February 11, 2020, a week after the adjudication hearing and two days before the disposition hearing, Father filed a section 388 petition, requesting the juvenile court "rescind" its jurisdictional findings.  In his memorandum of points and authorities supporting the petition, Father asserted new "evidence now proves Father's factual innocence" and "demonstrates unequivocally that [Father] could not have sexually abused minor L[.G.], because L[.G.] and M[.S.] did not sleep at Father's residence on the relevant date of August 10 to August 11, 2018."  Father attached the new evidence—his cell phone bill for the period of July 15, 2018 through August 14, 2018—to his declaration in support of the petition.  According to Father's declaration, he called Mother's cell phone on August 11, 2018 at 4:43 a.m., and again at 5:00 a.m. "to advise that [he] was outside waiting for the girls," and Mother returned his call at 5:07 a.m.  He pointed to the page of his cell phone bill reflecting these calls.  Father also stated in his declaration that the call his sister testified she made to him on the night of August 10, 2018 is reflected on his cell phone bill as an 11:16 p.m. call from "Blocked NBR – incoming," because his sister called him from her son's phone "which was issued to him by the County of Los Angeles which comes up as a blocked number when placing a call."

On February 13, 2020, the day of the disposition hearing, Father filed a "Motion in Limine for Disqualification of Minors'

31

Counsel," pursuant to California Rules of Court, rule 5.660, which sets forth "[c]onflict of interest guidelines for attorneys representing siblings" in dependency proceedings. (Cal. Rules of Court, rule 5.660(c).) In the motion, Father stated: "In this matter, there is reason to believe that [counsel for L.G. and M.S.] has an existing and continuing conflict in her representation of minor M[.S.] because of her representation of minor L[.G.] On February 7, 2020, Father's counsel sent minors' counsel a letter setting forth the basis for the conflict and requesting that minors' counsel recuse herself. . . . The conflict is especially germane to the upcoming disposition hearing in that minors' counsel indicated that [she] will be requesting that the case terminate with Mother being given full legal and physical custody. Due to the distinct and persuasive evidence bearing significantly on the credibility of L[.G.], counsel cannot at the same time objectively evaluate L[.G.]'s credibility and advocate against M[.S.]'s relationship with her father. In addition, due to the new evidence presented to the Court in Father's . . . § 388 petition, this information is also new to M[.S.]'s counsel, for which M[.S.] should also be filing a . . . § 388 petition, but for it would be a conflict to the representation of L[.G.] Conflict is inescapable and [m]inors' counsel must be recused." Father attached to this motion the February 7, 2020 letter his counsel sent to counsel for L.G. and M.S. The letter attached Father's cell phone bill for the period of July 15, 2018 through August 14, 2018.

On February 13, 2020, the day of the disposition hearing, DCFS filed a Last Minute Information for the Court, recommending L.G. and M.S. "remain in the home of [Mother] and that jurisdiction be terminated for these children" and that Father "be given monitored visitation with the child M[.S.] and

no visitation with the child L[.G.]"  DCFS also reported in the Last Information for the Court that M.S. spontaneously told the social worker during a home visit on January 14, 2020 that she "had a funny story about her dad."  M.S. stated that on an occasion when she was four years old,[17] Father was wearing underwear with a hole in the right upper thigh.  He pulled the underwear off and put on another pair, which also had a hole.  M.S. indicated she saw Father's buttocks, but not his penis, on that occasion.  The social worker asked M.S. if she had ever seen Father's penis.  M.S. stated she took a shower with Father when she was four years old, and she saw his penis then.  The social worker "believe[d] that M[.S.] might be making small disclosures to test adult reactions."  Mother agreed to address any additional such disclosures with the social worker and M.S.'s therapist.

## IX.    Disposition

At the outset of the February 13, 2020 disposition hearing, the juvenile court stated it was denying Father's section 388 petition without a hearing, explaining:  "The court has already made credibility findings as to the minor L[.G.]'s statements.  And the documents proffered in support of the 388 [petition] are insufficient to warrant a hearing on the 388 [petition]."

Next, the juvenile court addressed Father's motion to disqualify counsel for L.G. and M.S.  The court asked the children's counsel:  "Do you believe there is a conflict of interest between your clients that prevents you from adequately representing both of your clients?"  The children's counsel responded negatively, and the court denied the motion.  Father's

_____

[17] M.S. was nearly six years old at the time of this home visit.

counsel did not make any arguments in support of his motion or ask to do so.

The juvenile court declared L.G. and M.S. dependents of the court, removed M.S. from Father, ordered both children to remain in Mother's home, and terminated dependency jurisdiction over L.G. As to M.S., the court stated: "I do understand that M[.S.] has a bond with [Father], and I don't think it would be to her benefit to close the case today." Counsel for L.G. and M.S. agreed with the court's decision to maintain jurisdiction over M.S. Father's counsel requested the court order conjoint counseling for Father and M.S., explaining he had discussed the matter with counsel for L.G. and M.S., who expressed no objection. The court ordered conjoint counseling for Father and M.S., if recommended by M.S.'s therapist. The court also ordered monitored visitation between Father and M.S. Finally, the court ordered Father and Mother to complete case plans comprised of case-related services.

Father appealed, challenging the jurisdictional findings and the disposition order regarding M.S. Counsel for M.S. (appointed by this court), filed a respondent's brief on appeal. DCFS filed a letter, stating it joined in the arguments made by M.S.'s counsel in the brief.

## DISCUSSION

### I.     Exclusion of Evidence of L.G.'s Medical Records and Medical Condition

Father contends the juvenile court erred (1) in granting L.G.'s motion to quash the subpoenas Father served on two of her treating physicians at the Medical Hub Clinic on the ground the medical records Father sought were protected from disclosure by the physician-patient privilege; and (2) in excluding, under

34

Evidence Code section 352, evidence Father sought to introduce at the adjudication hearing that L.G. tested positive for Chlamydia. We begin with the latter contention.

Under Evidence Code section 352, the "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " 'We will not overturn or disturb a trial court's exercise of its discretion under section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd.' " (*Butler v. LeBouef* (2016) 248 Cal.App.4th 198, 207.)

Evidence that L.G. tested positive for Chlamydia in October 2019 is not relevant to the issue of whether Father raped her more than a year before in August 2018. Father was seeking to use this evidence to challenge L.G.'s credibility at trial based on his speculation (1) that L.G. knew she had Chlamydia in August 2019 when she wrote her school essay; and (2) that L.G. concocted a plan to wrongfully accuse Father of rape so she could blame him for giving her Chlamydia and hide from Mother that she was sexually active. Any minimal probative value of this evidence on L.G.'s credibility was substantially outweighed by the probability that admission of the evidence would necessitate undue consumption of time and create substantial danger of undue prejudice and of confusing the issues. Although this case involves a court trial, and not a jury trial, these considerations still come into play. The juvenile court's decision to protect L.G. from attacks on her credibility with minimally probative and highly personal information was not arbitrary. Father was not

35

prevented from otherwise challenging the credibility of L.G.'s statements/testimony. In the absence of manifest abuse, we will not disturb the juvenile court's decision.

Because we conclude the juvenile court did not err in excluding under Evidence Code section 352 all evidence of L.G. testing positive for Chlamydia, we need not address Father's contention the juvenile court erred in granting L.G.'s motion to quash the subpoena for L.G.'s medical records. Both below and on appeal, Father made clear the medical records he sought by the subpoenas were those demonstrating L.G. tested positive for Chlamydia. Thus, the medical records were covered by the juvenile court's ruling excluding under Evidence Code section 352 all evidence of L.G. testing positive for Chlamydia.

## II. Denial of Father's Motion to Disqualify the Children's Counsel

Father contends the juvenile court erred in denying his motion to disqualify the children's counsel, made after the adjudication hearing on grounds counsel had a conflict of interest in representing both L.G. and M.S.

California Rules of Court, rule 5.660(c) sets forth "[c]onflict of interest guidelines for attorneys representing siblings." As set forth in the rule, a juvenile court "may appoint a single attorney to represent a group of siblings involved in the same dependency proceeding." (Rule 5.660(c)(1)(A).) "An attorney representing a group of siblings has an ongoing duty to evaluate the interests of each sibling and assess whether there is an actual conflict of interest." (Rule 5.660(c)(2)(A).) "If an attorney believes that an actual conflict of interest existed at appointment or developed during representation, the attorney must take any action necessary to ensure that the siblings' interests are not

36

prejudiced," such as notifying the juvenile court of the conflict or requesting to withdraw from representing some or all the siblings.  (Rule 5.660(c)(2)(D).)  "If the court determines that an actual conflict of interest exists, the court must relieve an attorney from representation of some or all of the siblings."  (Rule 5.660(c)(2)(E).)  The fact that "siblings have different parents," by itself, does "not necessarily demonstrate an actual conflict of interest"; nor does the fact that "[t]here is a purely theoretical or abstract conflict of interest among the siblings."  (Rule 5.660(c)(2)(B)(ii) & (iii).)  "[U]nder rule 5.660(c), a conflict becomes 'actual' when an attorney's duties of loyalty, confidentiality, and zealous advocacy require the attorney to take or to refrain from taking some action to serve the 'best interests' of one minor client, but the attorney is unable to do so without violating a duty owed by the attorney to another client; or when the attorney is unable independently to evaluate the best interests of each minor client because of the minors' conflicting interests."  (*In re Zamer G.* (2007) 153 Cal.App.4th 1253, 1267, 1272 (*Zamer G.*).)

　　　" 'Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion.  [Citations.]  If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence.  [Citations.]  When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion.  [Citation.]  However, the trial court's discretion is limited by the applicable legal principles.  [Citation.]  Thus, where there are no material disputed factual issues, the appellate court reviews the trial

37

court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion.' " (*Zamer G.*, *supra*, 153 Cal.App.4th at pp. 1262-1263.) "On appeal, we must indulge '[a]ll intendments and presumptions . . . to support [the lower court's order] on matters as to which the record is silent.' " (*Id.* at p. 1271.) A juvenile court's error in not relieving counsel from representing multiple siblings, where there is an actual conflict in the representation, is subject to harmless error analysis, and we reverse only if it is reasonably probable the result would have been more favorable to appellant but for the error. (*In re Celine R.* (2003) 31 Cal.4th 45, 50, 59-60.)

Father asserts on appeal: "Evidence developed at trial which significantly undermined L[.G.]'s credibility. If L[.G.] was lying, and no sexual abuse occurred, then it was against M[.S.]'s best interest to have her relationship with [Father] undermined by continued detention from him, only limited monitored visitation, and the potential that jurisdiction could eventually be terminated awarding Mother sole legal and physical custody and [Father] only limited contact with her."

Father ignores M.S.'s statements to Mother and her therapist that she remembered wiping something off L.G.'s back as L.G. cried, while Father was present in pajama shorts. M.S.'s statements corroborate L.G.'s account and support the children's counsel's decision to advocate for dependency court jurisdiction over M.S. and removal from Father. Other statements M.S. made to Mother and the social worker—that Father had forced her to take a little purple pill to go to sleep and that he had taken off his underwear in front of her and showered with her—were

38

additional cause for concern about her safety with Father, in light of her corroboration of some of L.G.'s statements.

The children's counsel expressed at the disposition hearing that she agreed with the juvenile court's decision to keep the case open to allow M.S. to reunify with Father, over DCFS's recommendation that the juvenile court terminate dependency jurisdiction with a family law order granting Mother sole custody and Father only monitored visitation.  In fact, Father based his motion to disqualify the children's counsel in part on his belief that the children's counsel would join in DCFS's recommendation at disposition.  Moreover, when Father requested conjoint counseling with M.S., the children's counsel did not object.  Taking these positions demonstrates counsel's ability to evaluate M.S.'s best interests independently from L.G.'s best interests.

Father argues that in order for the children's counsel to zealously advocate for M.S., counsel needed to attack L.G.'s credibility at trial regarding the molestation and rape allegations by (1) not objecting to the admission of evidence of L.G.'s positive test results for Chlamydia; (2) exploring evidence Father presented at trial to show L.G. and M.S. did not spend the night at his home on August 10, 2018 (e.g., the text messages between Mother and Father); and (3) challenging L.G. on a lengthy list Father put together of purported inconsistencies between L.G.'s statements to the police officers and the social worker, her statements during her forensic interview, and her trial testimony.[18]  Moreover, Father argues zealous advocacy of M.S.

_____

[18] For example, Father points out, among other things:  (1) L.G. did not mention the August 10, 2018 wrestling incident in her statements prior to her forensic interview; (2) in the forensic interview, L.G. stated the August 10, 2018 wrestling incident

required the children's counsel to join in or, at a minimum, investigate his section 388 petition, seeking to "rescind" the jurisdictional findings based on new evidence—his cell phone bills showing incoming and outgoing calls on August 10-11, 2018.

We already discussed above the reasons the trial court properly excluded evidence of L.G.'s positive test results for Chlamydia. M.S.'s best interests would not have been furthered by attacking L.G.'s credibility with this minimally probative information.

Father ignores the fact that, after considering all the evidence presented at trial, the juvenile court made a finding that L.G. was credible in her statements/testimony that Father molested and raped her. It is not the province of this court to reevaluate a witness's credibility. Moreover, Father does not suggest what M.S.'s counsel could have or should have done, above and beyond what Father's counsel did, to further explore evidence he presented or to point out purported inconsistencies in L.G.'s statements/testimony.

Regarding Father's section 388 petition, the juvenile court reviewed Father's new evidence and denied the petition without a hearing, based on its finding L.G. was credible. It is not reasonably probable the result would have been more favorable to Father if counsel for M.S. joined in the petition or conducted additional investigation regarding Father's new evidence.

---

happened on the couch, but at trial she testified the incident happened on Father's bed; and (3) in her forensic interview and at trial, L.G. discussed portions of the events on August 11, 2018 out of chronological order, recalling later in her statement/testimony something that came before in the chronology.

Under either the abuse of discretion or de novo standard of review,[19] the juvenile court did not err in denying Father's motion to disqualify counsel for L.G. and M.S. based on an actual conflict of interest. Counsel demonstrated she was able to independently evaluate and zealously advocate for M.S.'s best interests. (Cf. *Zamer G.*, *supra*, 153 Cal.App.4th at p. 1272 [juvenile court did not abuse its discretion in its pre-adjudication decision to disqualify counsel, where substantial evidence supported juvenile court's finding of an actual conflict of interest in counsel's representation of four siblings/half siblings, where counsel "would have to dispute the accuracy or reliability" of statements of abuse made by two siblings in order to "advocate in favor of reunification" between their abuser and their two half siblings, and counsel "could not professionally and independently *evaluate* each child's best interests when faced with this dilemma"].)[20]

_____

[19] Father asserts that in ruling on his motion, the juvenile court did not make factual findings on material disputed issues, so we should review the matter de novo. We need not reach the issue because we would not disturb the juvenile court's decision under either standard of review, based on the reasons set forth above.

[20] Father's reliance on *Zamer G.* in support of his contention the juvenile court erred in denying his motion to disqualify the children's counsel is misplaced because *Zamer G.* is distinguishable on its facts. The juvenile court in *Zamer G.* disqualified counsel pre-adjudication. (*Zamer G.*, *supra*, 153 Cal.App.4th at p. 1272.) Here, Father made his motion to disqualify the children's counsel post-adjudication, after the juvenile court had already (1) made a finding that L.G.'s statements regarding Father's sexual abuse were credible and (2) determined the new evidence Father submitted with his section

And, even assuming counsel had an actual conflict, Father cannot show it is reasonably probable the outcome in this case would have been more favorable to him if the juvenile court had disqualified counsel from representing M.S. and appointed separate counsel.

## DISPOSITION

The jurisdictional findings and disposition order regarding M.S. are affirmed as to Father.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

---

388 petition did not alter the court's finding as to L.G.'s credibility.